IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL MASON,

                                 OPINION AND ORDER

          Plaintiff,

                                  19-cv-83-bbc

     v.

GREEN COUNTY, BRADLEY GILBERT, RANDALL
A. TEUTSCHMANN, AND SCOTT A. ELLEFSON,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Michael Mason contends that deputies from the Green County Sheriff's Department violated his Fourth Amendment rights by entering and searching his home without a warrant. Defendants have filed a motion for summary judgment, contending that the warrantless search was justified by exigent circumstances and the community caretaker doctrine. Defendants also contend that they are entitled to qualified immunity. However, defendants have failed to show that any reasonable officer in their position would have believed that the warrantless search was lawful under the Fourth Amendment. Therefore, I am denying defendants' motion. I am also directing the parties to submit supplemental briefing regarding the issues remaining in this case.

      From the parties' proposed findings of fact and evidence in the record, I find the following facts to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

At times relevant to this case, plaintiff Michael Mason lived in a house in the Village of Brooklyn, Wisconsin, with his 17-year old daughter Madeline Mason and his friend Marty Packard. Plaintiff's parents, Sharon and Jim Mason, lived in a house behind plaintiff's. The two houses were approximately 100 yards apart, with adjoining backyards.

Defendants Bradley Gilbert, Randall Teutschmann and Scott Ellefson were deputies with Green County Sheriff's Department. Each defendant had been a law enforcement officer for more than 20 years at the time of the relevant incident.

### B. The October 17, 2016 Incident

On October 17, 2016, plaintiff and his daughter, Madeline, went to plaintiff's parents house for lunch at about noon. Madeline and plaintiff's mother, Sharon, were in the living room, when plaintiff and his father, Jim, began arguing in the kitchen. They were arguing about money and a gun that plaintiff had borrowed from Jim. Plaintiff told Jim that the gun was up north at his cabin in Waushara County, and that plaintiff would get the gun the next time he was at the cabin. Madeline and Sharon could hear screaming and could tell that plaintiff was angry. They went into the kitchen and they saw plaintiff grab Jim by the shirt as if he was going to punch him. (Jim was 78 years old at the time.) Madeline grabbed plaintiff's arm and said, "It's ok. Let's leave." Plaintiff said, "No," and shoved Madeline off

2

of him.  Plaintiff also pushed Sharon.  Jim asked for the police to be called.  Madeline was scared that somebody would get hurt, and she went to another room and called the police.  Sharon followed Madeline, and plaintiff left the house.

Madeline told the police dispatcher that her father was angry, that she was afraid, and that she believed her father had returned to his house.  The dispatcher asked to speak with an adult, and Madeline gave the phone to Sharon.  Sharon was crying.  She told the dispatcher that plaintiff had said to Jim, "You'll get your gun back, and it will be loaded."  Sharon told the dispatcher that this comment scared her.  Sharon and Madeline also told the dispatcher that plaintiff was angry and that they there were afraid he was going to return.

The Village of Brooklyn is on the county line between Green County and Dane County.  Officers were dispatched to the scene from several law enforcement agencies, including Green County Sheriff's Department, Dane County Sheriff's Department, Oregon Police Department, Evansville Police Department and Brooklyn Police Department.  Dispatch reported to the officers that plaintiff had shoved both his mother and daughter following an argument with his father, had threatened to get a firearm and return to his parents' house and had left his parents' house.  Dispatch also reported that plaintiff's location was unknown, but that the 911 caller believed plaintiff had returned to his own house.  Dispatch stated that the family did not know whether plaintiff would return with a firearm, but that he had a bad temper and was an avid hunter with access to weapons.

Officers were dispatched at approximately 1 p.m., and it took officers approximately 20 minutes to arrive at plaintiff's house.  Defendant Teutschmann was one of the first

3

officers to arrive on the scene. He arrived at about the same time as Brooklyn Chief of Police Barger, who is not a defendant in this case. Teutschmann saw a young woman looking out the window of plaintiff's parents' house. She looked scared. Teutschmann signaled for her to remain in the house, and Teutschmann then approached plaintiff's house. Teutschmann saw that the door to the attached garage at plaintiff's house was open, and that there was a gray Toyota Camry parked in the garage. Teutschmann provided the license plate number to dispatch, and he was told that the car was registered to plaintiff. (Teutschmann later learned from dispatch that the Camry belonged to Madeline, and that plaintiff usually drove a tan Chevrolet. The Chevrolet was gone.) Teutschmann pounded on the door leading from the garage to the house and announced his presence several times, but he received no response. Chief Barger, who was about 75 yards away from the house, radioed to Teutschmann that he thought he saw movement through a window of the house. Teutschmann approached the house and looked in a window. He saw a cat in the window, but did not see any people. Teutschmann went to the front door of the house with a Dane County deputy. He announced his presence and pounded on the front door, but received no response.

Meanwhile, Chief Barger spoke with plaintiff's parents and Madeline. Sharon was crying. Sharon and Jim requested a 72-hour no-contact order with plaintiff, stating that they were afraid of him. Barger learned that Madeline drove the Camry that was in the garage. After Barger talked to the parents and daughter, he returned to his squad car.

Defendant Gilbert arrived on the scene a short time after Teutschmann and Barger.

4

Gilbert and other officers set up a perimeter around plaintiff's residence. Gilbert also looked into a living room window at plaintiff's house. He saw a light on in the living room, but did not see people inside.

Defendant Ellefson was also dispatched to the scene. He was told by dispatch that a male subject had gotten into a pushing match, had threatened to obtain a firearm and had left. Dispatch reported that it was unknown whether the subject was at his house or somewhere else. By the time defendant Ellefson arrived, there were seven or eight officers already on the scene.

At 1:35 p.m., a dispatcher reported to deputies on the scene that Madeline had said there was no reason to believe that plaintiff might be injured. The dispatcher also relayed that Madeline believed plaintiff's guns were at a cabin in Waushara County, that she had never seen guns in plaintiff's house and that there was no gun cabinet in the house. The dispatcher confirmed that plaintiff had not returned to his parents' house. The dispatcher also reported that Madeline and plaintiff's parents had stated that if plaintiff's car was gone, he was probably gone too.

The dispatcher then called plaintiff's cell phone number. Plaintiff answered and told the dispatcher that he was a truck driver who kept his truck in Madison, and that he was currently in Madison loading his truck, preparing to leave on a 10-day trip to Ohio. Plaintiff was calm and cooperative. The dispatcher told plaintiff that she would send an officer over to talk to him. Plaintiff had questions, so the dispatcher transferred the call to Chief Barger. Plaintiff told Barger that he was working in Madison, and he provided the address where he

was working. Barger relayed this information to defendants Teutschmann and Gilbert. Barger stated that he thought it was unlikely that plaintiff was in the house. Barger then told Teutschmann that the officers could come gather where he was, or they could do a quick protective sweep of the house. Teutschmann asked Barger if the deputies should clear the house to determine whether plaintiff was still in it, and Barger agreed that they should do so. At that time, the officers had been at the scene for approximately half hour. It had been approximately one hour since Madeline's 911 call.

The dispatcher did not send an officer to speak with plaintiff because she thought that that decision would be made by Chief Barger, after Barger talked to plaintiff. It would have been normal practice to have another officer from another agency confirm plaintiff's location and speak with him. However, defendants and Barger did not discuss whether they should wait to see whether a Dane County or Madison police officer could apprehend plaintiff in Madison before entering plaintiff's house. Plaintiff ended up waiting two hours at his location in Madison after talking to Barger, but no officer ever showed up.

While other officers remained on the perimeter of plaintiff's residence, Teutschmann, Ellefson and Gilbert approached the front door of the residence, announced their presence and asked plaintiff to come to the door. After waiting 15 to 20 seconds with no response, the deputies entered through the unlocked door. Defendants cleared the upper level of the residence room by room and found nobody. Defendants then entered the basement stairwell and smelled an overwhelming odor of fresh marijuana. When they entered the basement, they found a marijuana grow operation. Defendants continued checking all the remaining

6

rooms in the basement for plaintiff and discovered nobody. After all the rooms were cleared, defendants exited the residence. Later that day, defendants obtained a search warrant to investigate the marijuana grow operation.

### C. State Court Criminal Proceedings

As a result of the evidence found during the second search, plaintiff was charged with three drug felonies and two drug misdemeanors. He was also charged with misdemeanor disorderly conduct for his behavior at his parents' home. Plaintiff testified that he had not known about the marijuana, and that the marijuana grow operation belonged to his friend, Marty Packard, who lived at plaintiff's house.

Plaintiff's criminal defense attorney filed a motion to suppress all of the evidence gathered as a result of the searches, on the ground that the warrantless entry had violated the Fourth Amendment and thus, both searches had been unlawful. The circuit court judge granted the motion, concluding that the initial entry into the home had violated the Fourth Amendment, and that all of the evidence was the fruit of the illegal search.

The circuit court judge found it significant that even though plaintiff was on the phone and cooperating with the police, the police made no attempt to ascertain whether plaintiff was where he said he was. Dkt. #21 at 15. The judge pointed out that defendants could have asked plaintiff to put a coworker on the phone, or defendants could have called the Madison Police Department for assistance. The judge estimated that a law enforcement officer could have verified plaintiff's location within a few minutes. Finally, the judge found

7

that the police could have tried to get a warrant to enter the house. Because police officers were surrounding the area and there was no indication that anyone was hurt or needed immediate police assistance, the police could have waited before entering. After the court granted the suppression motion, all of the drug charges against plaintiff were dismissed. Plaintiff later pleaded no contest to the disorderly conduct charge.

OPINION

Plaintiff contends that defendants violated his Fourth Amendment rights by entering and searching his home without a warrant. A warrantless entry into a person's home violates the Fourth Amendment, unless an exception to the warrant requirement applies. Payton v. New York, 445 U.S. 573, 585 (1980). See also Groh v. Ramirez, 540 U.S. 551, 559 (2004) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable."). In this instance, defendants contend that there were two exceptions that justified the warrantless entry: exigent circumstances and the community care doctrine.

A.  Exigent Circumstances

A warrantless entry into a dwelling may be lawful when there is a pressing need for the police to enter but no time for them to secure a warrant. See, e.g., Michigan v. Tyler, 436 U.S. 499, 509 (1978); Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013). Exigent circumstances justify a warrantless entry when, for example, law enforcement must rescue an individual from imminent danger, prevent a suspect from escaping or prevent the

destruction of evidence. Sutterfield v. City of Milwaukee, 751 F.3d 542, 557 (7th Cir. 2014) (citing cases); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). Whether the exigent circumstances exception justifies warrantless action is judged by an objective standard: courts ask whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant. Fitzgerald, 707 F.3d at 730.

Defendants cite the following circumstances as justification for their decision to enter the home:

- plaintiff's daughter called 911 call to report a verbal and physical domestic dispute;
- plaintiff threatened to return to his parents' house with a loaded gun;
- plaintiff had access to firearms and knew how to use them;
- plaintiff's location was unknown;
- there was a vehicle in the garage, suggesting someone might be home;
- nobody responded when officers knocked on the doors; and
- in light of the proximity and unobstructed view between plaintiff's and his parents' residences, plaintiff could potentially fire a rifle from his house into his parents' house.

From these factors, defendants say, they believed that plaintiff could be in his house

9

and could be an imminent threat to his family and the surrounding community. Sutterfield, 751 F.3d at 557 (exigency exists if "occupant is armed and might shoot at the police or other persons"). Defendants point out that a local school had been placed on lockdown as a result of the incident.

However, in evaluating the legality of a warrantless search, courts must consider "the totality of facts and circumstances." Martinez v. City of Chicago, 900 F.3d 838, 845 (7th Cir. 2018). In this instance, defendants' arguments are undermined by several facts that they fail to discuss. Although defendants were investigating a domestic incident that included plaintiff's apparent threat to return with a loaded gun, the domestic incident had ended an hour before defendants decided to enter plaintiff's house. In the meantime, plaintiff had not been seen, he had not attempted to return to his parents house or communicate with them in any way, and Madeline told police that plaintiff kept his guns at his hunting cabin and that there were no guns in the house. These facts distinguish this case from those in which courts have found exigency based on ongoing disturbances or escalating situations. Compare Fisher, 558 U.S. at 48-49 (exigent circumstances supported officers' entry into house where there were signs of recent injury outside house and officers could see subject engaging in violent behavior inside), with Smith v. Kansas City, Missouri Police Department, 586 F.3d 576, 579 (8th Cir. 2009) (officer's warrantless entry into home of domestic violence suspect not justified by exigent circumstances where officer had no information that any victim or potential victim was inside home or that threat was ongoing).

In addition, there were no signs that plaintiff was in his house. His car was gone, and

his family had told the police that if his car was gone, he was likely gone too. Defendants knew that Madeline, not plaintiff, used the car that was in the garage. There were no sounds from the house. One officer reported seeing possible movement in a window, but upon closer examination, determined that the only visible creature in the house was a cat.

Finally, and most significantly, defendants had made contact with plaintiff by telephone. Plaintiff was cooperative and calm, told defendants that he was working in Madison and gave them the specific address where he was located. He stated that he would be there for a while, loading his truck. All of these factors suggest that plaintiff was not home and did not pose an imminent threat to anyone's safety.

Defendants argue that they did not have to accept plaintiff's statement that he was in Madison because he could have been lying. Similarly, defendants could not just accept Madeline's statement that plaintiff kept his guns at his hunting cabin and that there were no guns in the house. Defendants also argue that even though plaintiff's car was gone, plaintiff could have moved it or someone else could have driven it. These are all valid points. Police are not required to just stand by and wait to see whether violence occurs; rather, they "may step in to prevent serious injury and restore order." United States v. Bell, 500 F.3d 609, 612 (7th Cir. 2007). However, the possibilities identified by defendants are not enough to support a finding of exigent circumstances, because these concerns could have dissipated with a reasonable investigation into plaintiff's whereabouts. United States v. Struckman, 603 F.3d 731, 746 (9th Cir. 2010) (holding that warrantless arrest was unreasonable where "probable cause could easily have been dissipated by minimal inquiry

11

at the outset"); Gooden v. Howard Cty., Md., 954 F.2d 960, 965 (4th Cir. 1992) ("What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced.").

As the state court judge pointed out, defendants could have determined whether plaintiff was in his house, or where he said he was in Madison, without making a warrantless entry into his house. Defendants argue that they should not have to "simply walk away" when there might be a dangerous situation. Dfts.' Br., dkt. #30, at 8. However, defendants did not need to walk away to conduct a reasonable investigation into plaintiff's location. They could have requested that a City of Madison or Dane County law enforcement officer check the location where plaintiff said he was, without any of the law enforcement officers having to leave the perimeter around the scene in Brooklyn. Defendants concede that such a step would have been normal practice, but they do not explain why they failed to take that step. The delay in waiting for another officer to investigate likely would not have been significant. An hour had already passed since plaintiff had been seen, and defendants do not explain persuasively why waiting a few more minutes would have presented an unacceptable safety risk. In addition, as the state court judge pointed out, defendants could have asked plaintiff whether anyone was present at his Madison location that could verify where he was. Defendants argue that the court should not rely on hindsight to find that there was no emergency or to come up with alternative ways that the police could have handled the situation, but these alternatives should have been obvious to officers on the scene,

particularly when they were weighing the decision to enter a house without a warrant. As the Supreme Court and court of appeals has stated many times, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Fitzgerald, 707 F.3d at 730 (quoting Welsh v. Wisconsin, 466 U.S. 740, 748 (1984)).

Defendants cite several cases in support of their arguments, but all are distinguishable and involved clearly exigent situations. For example, defendants cite Sutterfield, 751 F.3d 542, to support their argument that exigent circumstances existed. However, in Sutterfield, the police entered a woman's home after her doctor reported to the police that she was suicidal, had stated that she might shoot herself and owned a gun. Id. at 557. See also Fitzgerald, 707 F.3d at 731 (exigent circumstances existed to enter home where subject in home had called police, sounded intoxicated and threatened suicide). In contrast, defendants had no information suggesting that anyone in plaintiff's house faced an imminent risk of harm.

Defendants cite Hanson v. Dane County, 608 F.3d 335, 337 (7th Cir. 2010), but that case also involved information suggesting that someone in the house that was searched might be facing an imminent risk of harm. The warrantless entry in that case was prompted by a disconnected 911 call. When the dispatcher called the number back, there was no answer. The court explained that a lack of an answer on the return of an incomplete emergency call implies that the caller is unable to pick up the phone because of injury, illness or a threat of violence. Id.

In Burke v. Sullivan, 677 F.3d 367, 372 (8th Cir. 2012), also cited by defendants,

13

officers made a warrantless entry into a home to find a suspect whose violent and erratic behavior had generated a domestic disturbance call. The court concluded that exigent circumstances were present because a potential victim was inside the home with the suspect. Similarly, in another case cited by defendants, United States. v. Black, 482 F.3d 1035, 1039 (9th Cir. 2007), the court concluded that the police's warrantless entry was justified because the police thought a domestic violence victim was inside the apartment, badly injured and in need of medical attention.

In contrast to all of these cases, defendants had no information suggesting that any potential victim was in plaintiff's house with him. The victims of his earlier domestic abuse, his daughter and his parents, were in his parents' home, being watched by police officers. In addition, the police had contacted plaintiff by phone, and he was calm, cooperative and willing to wait at his location in Madison until an officer came to speak with him. Under the totality of the circumstance, defendants have not shown that entry into plaintiff's home was justified by exigent circumstances.

Defendants also have not shown that they are entitled to qualified immunity. Qualified immunity shields government officials from money damages unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. Reichle v. Howards, 566 U.S. 658, 664 (2012). At the time defendants entered plaintiff's home, it was clearly established that police officers need a warrant to enter a home unless they meet one of the exceptions to the warrant requirement identified by the Supreme Court. Stuart, 547 U.S. at 403 ("It is a basic principle of Fourth Amendment law

14

that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotations omitted). With respect to exigent circumstances, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. Under the circumstances here, no reasonable officer would have concluded that he needed to enter plaintiff's home to render emergency assistance or protect an occupant or potential victim from imminent injury. A reasonable officer would have known that he should attempt to verify where plaintiff was before entering the home. Therefore, defendants are not entitled to qualified immunity.

B. Community Caretaker Doctrine

Defendants also argue that the warrantless entry was justified under the community caretaker doctrine. The community caretaker doctrine is similar to the exigent circumstances doctrine, and allows police officers to engage in certain community caretaking functions, unrelated to criminal law enforcement, to protect members of the public. Cady v. Dombrowski, 413 U.S. 433, 441 (1973); Long v. United States, 847 F.3d 916, 921 (7th Cir. 2017). In Cady, the Supreme Court held that a warrantless search of an automobile in police custody did not violate the Fourth Amendment because the search was performed for safety reasons, not to detect or investigate criminal activity. Cady, 413 U.S. at 441. The Court of Appeals for the Seventh Circuit has limited the community caretaker doctrine to warrantless searches of automobiles. Sutterfield, 751 F.3d at 551. But Wisconsin courts

have interpreted the doctrine more broadly, holding that a search or seizure may be justified under the community caretaker doctrine if the police officer is conducting a bona fide caretaker activity, and the public interest supporting the search or seizure outweighs the intrusion upon the privacy of the individual. State v. Kramer, 2009 WI 14, 21, 315 Wis. 2d 414, 759 N.W.2d 598.

The Wisconsin standard is relevant here, because defendants have invoked qualified immunity. If there is no United States Supreme Court case that clearly establishes a right, Wisconsin cases are relevant to what a reasonable Wisconsin officer would have thought the law permitted in responding to a situation. Stanton v. Sims, 571 U.S. 3, 5 (2013) (per curiam); Sutterfield, 751 F.3d at 573. Defendants contend that reasonable Wisconsin officer would have thought that Wisconsin's community caretaking doctrine permitted them to enter, or at least did not prohibit them from entering, plaintiff's home to insure that he was not inside with a firearm.

Defendants' qualified immunity argument is not persuasive. Defendants have identified no cases, nor have I found any, in which a Wisconsin court applied the community caretaking doctrine to uphold a warrantless entry into a home under circumstances similar to those in this case. Instead, as plaintiff points out, Wisconsin courts have applied the community caretaking doctrine to situations in which officers entered a home to check on the health and wellbeing of people inside. See, e.g., State v. Pinkard, 2010 WI 81, 327 Wis. 2d 346, 785 N.W.2d 592 (2010) (police officers were exercising legitimate community caretaking function when they performed warrantless entry and sweep of

dwelling in response to report suggesting that occupants were unconscious, possibly as result of drug abuse); State v. Horngren, 2000 WI App 177, 238 Wis. 2d 347, 617 N.W.2d 508 (officers' warrantless entry and search of home after receiving information about suicide threat was legitimate community caretaker action). These cases would not apply here, as defendants had no reason to believe that plaintiff or anyone inside his home needed medical assistance of protection.

Wisconsin has identified several factors that should be considered in determining whether an officer was exercising a legitimate community caretaker function. These factors are clearly established. First, the court considers whether the officers identified a bona fide community caretaking concern, such as protection of a person or property. Pinkard, 2010 WI 81, ¶ 26. To be bona fide, the officers must be acting on sufficiently reliable evidence. Id. at ¶ 36. Then the court weighs the public interest in acting on that concern against the Fourth Amendment privacy interest at issue. Id. at ¶ 26. In doing so, the court considers (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished. Id. at ¶ 42.

In this instance, a reasonable officer would not have thought that the community caretaking doctrine justified entry into plaintiff's home without further investigation. Although a community caretaking interest was implicated by the situation–protection of

plaintiff's parents and daughter from potential violence–the officers did not have reliable information suggesting that they needed to enter and search plaintiff's home at the time they conducted the search. The exigency of the situation was low, and there were feasible alternatives, namely, verifying plaintiff's purported location. Accordingly, Wisconsin's clearly established law prohibited the search of plaintiff's home under the circumstances here. Defendants are not entitled to qualified immunity.

C. Remaining Issues

For the reasons stated above, I am denying defendants' motion for summary judgment. Plaintiff did not move for summary judgment, but it appears that there are no genuine disputes of material fact with respect to liability on plaintiff's warrantless entry claim. Therefore, I will direct defendants to file a supplemental brief identifying any disputed issues of fact that would preclude summary judgment on liability to plaintiff under Rule 56(f) of the Federal Rules of Civil Procedure. Defendants should focus on any factual disputes, and should not reargue legal points that they have already raised in in their summary judgment briefing.

If plaintiff's motion for summary judgment on liability is granted, that would leave only the question of damages. Plaintiff states in his complaint that he is seeking to recover damages for emotional distress, damage to his personal and professional reputation and financial losses, including attorney's fees he paid in defending himself in the state court criminal action. Plaintiff says that he lost his job and was forced to take a lower-paying job

as a result of the criminal prosecution. He also seeks punitive damages.

Plaintiff's theory of compensatory damages appears to be barred by the law of this circuit. The Court of Appeals for the Seventh Circuit has explained that in Fourth Amendment civil cases, damages are limited to the harm arising directly from the constitutional violation at issue. For example, if a person is detained without probable cause or reasonable suspicion, but the officer finds an illegal firearm during the detention, the person may recover damages only for the brief unlawful detention. Martin v. Marinez, 934 F.3d 594, 598 (7th Cir. 2019). The individual cannot recover for damages arising from the subsequent arrest, incarceration or prosecution, because the arrest was supported by probable cause, and the exclusionary rule does not apply in civil cases. Id. Applying these principles to the present case, plaintiff could recover only for damages, if any, that he suffered as a result of the warrantless entry and search. His subsequent arrest and prosecution were supported by probable cause that he had a marijuana grow operation in his basement. Therefore, plaintiff cannot recover for attorney fees or other harm he suffered in connection with his prosecution.

Plaintiff also seeks punitive damages. The undisputed facts of the case do not seem to support a claim for punitive damages. The facts suggest that defendants acted unreasonably by searching plaintiff's home before seeking a warrant or attempting to verify plaintiff's location; they do not suggest that defendants acted maliciously or with reckless disregard for plaintiff's rights. Therefore, I will direct plaintiff to submit a supplemental brief identifying specifically his theory of damages and what facts, if any, he thinks need to

be presented to a jury.

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Green County, Bradley Gilbert, Randall Teutschmann and Scott Ellefson, dkt. #9, is DENIED.

2. Defendants may have until April 13, 2020, to file a brief identifying any disputed issues of fact that would preclude summary judgment on liability to plaintiff under Rule 56(f) of the Federal Rules of Civil Procedure. Plaintiff may have until April 20, 2020, to file a response brief, if he chooses to.

3. Plaintiff may have until April 13, 2020, to file a brief explaining his theory of damages and what issues, if any, remain to be resolved by a jury. Defendants may have until April 20, 2020, to file a response brief, if they choose to.

Entered this 30th day of March, 2020.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge